[Civ. No. 17804. Second Dist., Div. One. Apr. 2, 1951.]

FUMIKO MITSUUCHI, Respondent, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), Appellant.

Paul E. Iverson and William P. Hogoboom for Appellant.

J. Marion Wright for Respondent.

HANSON, J. pro tem.—This case, which is an outgrowth of an escheat action instituted in 1944 by the State of California, is not in and of itself in any aspect unusual, but the action of the representatives of the state in the case upon which it is based seems to us to have violated the public policy of this state. While we shall have more to say concerning that observation it is sufficient at this point to concede that the case before us presents a very simple question for solution. That question, stripped of unnecessary details, is whether the appellant bank under an indemnity provision in a trust deed was entitled to recover reasonable attorney's fees and costs from respondent by reason of its defense of the validity of its trust deed lien in the escheat action.

A statement of the facts addressed to the point under consideration will suffice. Sometime prior to the year 1936 one Arnold was the owner of the property here involved, generally

known as "Arnold Ranch," subject to a trust deed lien in favor of the defendant bank. The property consisting of 71 acres was located at the corner of Sawtelle and National Boulevards in the city of Los Angeles. Arnold failed to comply with the terms of the trust deed, and hence, the bank foreclosed it and bid in the property. Thereupon the bank leased the property to the son of Arnold, for a year at a time, subject to sale with the right of immediate possession. The bank upon acquiring the fee title promptly listed the land for sale with brokers but it was not until March, 1938, that it received an acceptable offer for the land from the respondent, an American citizen of Japanese ancestry. As a result of negotiations between the parties, it was agreed that the bank should convey the land to respondent upon the payment of $10,000 in cash and the execution and delivery of a purchase money note for $78,562.50 to be secured by a purchase money deed of trust.

Thereupon the appellant bank opened an escrow with the Title Insurance and Trust Company for completion of the transaction. The bank's instructions required the delivery to it of a title insurance policy guaranteeing the validity of the proposed trust deed lien. A few days later the tenant Arnold called at the bank with respect to a renewal of his lease and was informed the land was being sold. Arnold had been hopeful of purchasing the land himself and upon learning respondent was the purchaser intimated to the bank that respondent was not purchasing the property with her own money and in her own behalf, but in trust for persons of Japanese ancestry who were barred by the Alien Land Law and accordingly, that the purchase was but a subterfuge to evade the law.

The bank promptly relayed this information to the title company. As the title company was not only under a duty to the bank to satisfy itself that the purchase was not being made to evade the law, but in its capacity as an insurer of titles was being called upon to insure the validity of the proposed trust deed, it concluded that, under the circumstances, it did not desire to undertake the possible liabilities involved. Accordingly, it so advised the appellant bank. Immediately thereafter, the respondent who had not been advised of the position taken by the title company visited it for the purpose of proceeding with her part of the escrow. By her answers to various questions put to her by the title company and from data and affidavits she supplied, the title company

became convinced that she was entitled to take and hold the land without in any respect violating the Alien Land Law. The bank upon being so advised by the title company entered into a new escrow. This escrow resulted in a conveyance of the land by appellant bank to respondent and the execution and recording of the trust deed executed by the respondent in which the bank was named as the beneficiary and the Los Angeles Trust and Safe Deposit Company as trustee.

Approximately six years later, i.e., in 1944, while the grantee of the land, an American citizen of Japanese descent, was interned with a host of other like citizens the attorney general of the state concluded that the grantee had acquired the land contrary to the Alien Land Law and thereupon instituted an action against the respondent grantee, along with the trustee and the bank as beneficiary of the trust deed seeking to have the realty escheated to the state as of the date when in 1938 respondent acquired the property by conveyance from the appellant bank. In that action the state charged that not only had the respondent acquired the property in violation of the provisions of the Alien Land Law but that the bank as beneficiary of the trust deed and as the grantor in the grant deed to respondent ''had been informed of and knew that the defendant (respondent) Fumiko Mitsuuchi was taking the purported fee title to the aforesaid property in her name for the use and benefit of another person who was in fact an alien Japanese, a native of the Empire of Japan, and one ineligible to become a citizen of the United States of America.''

The beneficiary (appellant bank) and the trustee of the trust deed elected to defend jointly against the escheat action and employed counsel of their own choice to represent them. Not only did the trustor of the trust deed by her answer deny the charges of the state, but the appellant bank and the trustee did likewise.

At or about the close of the evidence on the last day of the trial, an assistant attorney general of the state accepted in behalf of the state an offer by the defendant Mitsuuchi (respondent here) that the state would upon the payment by her to it of $75,000 stipulate to a judgment quieting title in Mitsuuchi and that the judgment would adjudicate that the trust deed lien of the appellant bank was in all respects valid. Pursuant to the acceptance of that offer respondent paid $75,000 out of her own funds, despite the fact that six years before she had purchased the entire tract from the bank for

a total consideration of only $88,562.50. The reasons which impelled her to do so are not shown by the record, but the inferences from the facts of which we take judicial notice are crystal clear. We note that Mitsuuchi, a native-born American citizen entitled to all the guaranties of the federal and state Constitutions had been placed in a detention camp by the military authorities. In view of all this, perhaps she feared that her property rights would be treated in the same manner, without regard to her constitutional rights. Accordingly, it undoubtedly appeared advisable to her to make the offer she made, in view of the fact, of which we take judicial notice, that the property she purchased in 1938 was in 1946 worth several times what she had paid for it. On the other hand we note that it was the public policy of the state to prevent title to agricultural lands to vest directly or indirectly in persons of Japanese ancestry who were not American citizens. That being true it would seem that the representatives of the state were not entitled to compromise the policy of the state by in effect having the state sell agricultural lands to such persons.

Under the indemnity provisions of the trust deed the trustor Mitsuuchi had agreed with the trustee and the beneficiary thereof, that either or both in order to protect the security of the trust deed were entitled "to appear and defend without cost to Beneficiary or Trustee any action or proceeding purporting to affect the security hereof or the rights or powers of either of them, and, should Beneficiary or Trustee elect . . . to appear in or defend such action or proceeding, [the trustor would] pay all their costs and expenses." The meaning of the phrase "costs and expenses" as thus used in the trust deed included attorney's fees. (*Mitau* v. *Roddan,* 149 Cal. 1 [84 P. 145, 6 L.R.A.N.S. 275].)

It is contended, however, that attorney's fees and costs (which it is stipulated are reasonable) paid by the beneficiary to its counsel in appearing and defending its trust deed in the escheat action are not recoverable from the trustor for two reasons. *First,* it is contended that the indemnity embraces only such actions or proceedings as are required to protect the validity of the trust deed lien against charges or liens resulting from the *acts* of the trustor. Merely to state the contention is to answer it.

The next contention is that the beneficiary and the trustee appeared and defended the escheat action not merely because the state sought to have the land escheated to it be-

cause the trustor was ineligible to take title but, additionally, because the attorney general charged the bank knew *that fact.* The complaint of the attorney general sought no affirmative relief against the bank other than that it be decreed it had no valid lien by its trust deed. It is a far cry for respondent to suggest, as she does, that the defense by the bank of its lien is not within the purview of its indemnity rights under the provisions of its deed. If it be assumed, for the purposes of argument, that the bank would have been a joint tort feasor with the appellant if the two had entered into the transaction with knowledge on the part of both that the appellant was ineligible to take title, the short answer is that there is not a scintilla of evidence to sustain it. The respondent does not contend there is any evidence whatsoever to support her, other than the unproved charge made in the petition (complaint) by the attorney general. Since when has an allegation in a pleading ever been regarded as evidence against the opposite party? The answer is never at all in the history of the law. Such an allegation is not only self-serving, but is hearsay as well. In *Farmer* v. *Associated Professors of Loyola College,* 166 Md. 455 [171 A. 361, 363], it is said, "Of course, the bill of complaint, although sworn to, is not evidence of the facts therein alleged in favor of the plaintiff. And testimony that the allegations therein were in accordance with statements made by plaintiff to her counsel was improperly admitted over objection." So in *Thomson* v. *Reynolds,* 53 Utah 437 [174 P. 164, 166], it is said, "The record thus shows that all of the testimony of appellant respecting the advancement of money to her husband was stricken from the record, and that the statements to the same effect in her complaint in the action which was alleged to be pending was not considered by the court, except to support the allegation in the answer in this case that another action was pending. The complaint was competent for that purpose, but was wholly incompetent for the purpose of proving that appellant had advanced money to her husband. That statement was merely a self-serving declaration, and was, for that reason if for no other, wholly incompetent to prove the fact alleged." In the case of *Blankman* v. *Vallejo,* 15 Cal. 638, 639, 645, it was said that "An answer is no proof for the defendant, under our statute; but his admission of a fact stated in the bill, is conclusive evidence against him."

The unproved allegations of the complaint in the escheat action, as appears from the cases cited, possessed no evi-

dential value whatsoever and were immaterial and irrelevant to prove any issuable facts in the instant case. However, it is worthy of note to observe that the appellant bank was not charged with having conspired with respondent to evade the Alien Property Law, but instead was merely charged with having knowledge of the fact that respondent was ineligible to take and hold the land in behalf of the alleged ineligible beneficiaries. The endeavor of the state was to obtain title to the land freed from any right, title or interest therein by the appellant and respondent. If the bank by the manner of its defense, and the proof it could procure and adduce to support it, would have been enabled to procure a finding that respondent was not ineligible to hold the property, its efforts would have redounded not only to its benefit but to that of respondent as well. The same is of course true with respect to the respondent. But the bank was not compelled under the indemnity provisions of the trust deed to rely upon any defense that might be made by the respondent. The judgment in the escheat action found that the charges made by the state were untrue. The respondent now and always has likewise maintained they were untrue and particularly that the charges made against the bank were false. Accordingly, it does not make sense for her to contend that because the bank sought to sustain her position and to repel false charges against itself the bank may not invoke its clear rights against her in accordance with the indemnity provisions of the trust deed. Nevertheless, respondent contends that the case of *Byron Jackson Co.* v. *Woods,* 41 Cal.App.2d 777 [107 P.2d 639], is an authority for her position. That the case is in no sense controlling or in point may readily be demonstrated. In that case the United States Tool Company sold its assets to the Byron Jackson Company and as a part of the consideration of the sale agreed to hold the purchaser harmless from any claims against it arising prior to the date of sale. Before and up to the date of the sale the United States Tool Company had manufactured certain tools which the Hughes Tool Company had contended infringed its patent rights. Not only did the purchaser obtain knowledge of this claim, but the indemnity agreement was executed primarily for the purpose of holding the purchaser harmless from claims of this character. The seller, however, was not under any contract with any of its own customers to supply the tool and hence the purchaser likewise was not under any obligation to supply the customers of its predecessor unless

it elected to do so and then only at its own risk. After the sale the Hughes Tool Company sued the United States Tool Company, the Byron Jackson Company and certain other companies for damages. After all the named defendants had appeared in the suit, one of the defendants made a cash settlement and as a consequence, the case was dismissed against all of the defendants without any determination as to their respective liabilities. The Byron Jackson Company thereupon sued the indemnitors on the indemnity agreement seeking to recover all the attorney's fees, expenses and costs it had incurred in defending the suit. In interpreting the contract of indemnity the court found that the United States Tool Company was liable for its own acts prior to the sale and that the Byron Jackson Company was liable for its acts of infringement subsequent to the sale. Accordingly, the court concluded that the Jackson Company could not recover at all because there was no evidence as to the ratio of liability as between the two companies. In the escheat case upon which the instant case is bottomed the judgment of the court found that there was no basis for a finding in favor of the state as against either the appellant bank or the respondent. Accordingly, the escheat case by the judgment entered therein stands merely as if a blanket charge had been made to the validity of the trust deed. On that basis the appellant bank was entitled to defend its security and receive the costs of its defense under the indemnity provisions of the trust deed.

We pass by a host of cases cited to us by the respondent as being altogether too far afield to require notice or discussion by us.

From what has so far been said by us it is apparent that the material findings of the trial court based, as they are, upon nothing other than the unproved charges in a petition (complaint) by the state are without a scintilla of evidence to support them. Accordingly as the trial court failed to find, as it should have found, that the appellant bank was entitled to judgment, the case is reversed with instructions to the trial court to enter judgment in favor of the appellant together with the costs below and on appeal.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied April 23, 1951, and respondent's petition for a hearing by the Supreme Court was denied May 28, 1951. Carter, J., voted for a hearing.