# I. E. MOORE v. FIRST NATIONAL BANK OF HOT SPRINGS

CA 81-88                                     623 S.W. 2d 530

Court of Appeals of Arkansas
Opinion delivered November 4, 1981
[Rehearing denied December 2, 1981.]

*Haley & Young, P.A.,* by: *John H. Haley* and *Martha L. Strother,* for appellant.

*Wootton, Land & Matthews,* by: *John B. Robbins,* for appellee.

TOM GLAZE, Judge. This case involves a guaranty instrument which was signed by I. E. Moore (Moore) to guarantee the performance of Star Development Corporation (Star) under a lease agreement between Star and First National Bank (FNB) of Hot Springs. First Arkansas Leasing Corporation (FALCO) participated in this business transaction as a agent for FNB. The guaranty and lease agreement were signed on January 14, 1977.

Prior to January 14, 1977, Star was formed for the purpose of operating a sawmill capable of cutting lumber which met requirements established by European export markets. Star arranged for Jack Smith Industrial Services (Industrial) to design and construct the sawmill, and it applied to FALCO to lease equipment necessary to build and operate the sawmill. Industrial was to sell the equipment to FALCO, and FALCO, through its affiliate FNB, would lease the equipment to Star. It was this lease agreement between Star and FNB that Moore agreed to guarantee on January 14, 1977.

After and pursuant to the lease agreement, FALCO issued its $216,875 purchase order to Industrial for the sawmill items described in the Star/FNB lease agreement. Industrial refused to fill FALCO's purchase order for all of the equipment, and in doing so, Industrial demanded that FALCO provide interim funds for delivery of part of the equipment. It further requested FALCO to pay the balance

of the contract price when Industrial delivered the remaining items to the sawmill site. After Industrial's rejection of FALCO's order, Moore's attorney and wife, on separate occasions, contacted FALCO by telephone, notifying it that Moore was revoking his guaranty of Star's obligation under the January 14, 1977, lease agreement.

Even though FALCO was given notice that Moore revoked his guaranty, FALCO and FNB continued to negotiate with Star and Industrial. FALCO agreed that it would give Industrial an interim payment of $100,000 when approximately one-half of the equipment was delivered. Star, in turn, agreed to commence monthly lease payments when this partial delivery was made rather than beginning payments on full delivery of the equipment as provided in the original January 14, 1977, lease agreement. The terms of this new agreement were reduced to a FALCO commitment letter dated March 15, 1977, which was addressed to and approved by Star and Industrial. Apparently, it was discovered FALCO could not legally provide the interim financing, and FALCO subsequently had FNB provide the interim funding instead. Moore was never advised of any of these negotiations and agreements.

In November, 1977, the sawmill was completed and Industrial was paid in full. After making two lease payments to FNB, Star defaulted. FNB duly sold the sawmill equipment and then proceeded to file suit against Star and Moore for the deficiency due under the FNB/Star lease agreement and Moore's guaranty of that agreement. The trial court rendered judgment against Moore.

On appeal, Moore contends that the trial court erred in holding Moore's guaranty was irrevocable when Star and FNB executed the January 14, 1977, lease agreement. In support of his contention, Moore argues: (1) The FNB/Star lease was void for lack of mutuality, and this fact rendered Moore's guaranty unenforceable as well; and (2) Alternatively, Moore was discharged when FNB and Star materially altered the lease agreement without notice to Moore.

Moore relies on the case of *Weil* v. *Chicago Pneumatic*

*Tool Company*, 138 Ark. 534, 212 S.W. 2d 313 (1919), to support his first argument. We believe Moore's reliance is misplaced. In *Weil*, Chicago Pneumatic contracted to sell vehicles to Weil, but a clause in the contract provided Chicago Pneumatic would not be liable for loss of profits or damage for failure to deliver goods ordered by Weil if the failure was:

> . . . caused by strikes, fires or other causes beyond its control, or delays occurring in the manufacture of its product . . . and [it] shall not be liable . . . for its failure to deliver goods ordered, or for the cancellation of this agreement.

The court in *Weil* held the parties' contract was void for want of mutuality, relying on the well-known rule that a contract which leaves it entirely optional with one of the parties as to whether or not he will perform his promise is not binding on the other. See *El Dorado Ice & Planing Mill Company* v. *Kinard*, 96 Ark. 184, 131 S.W. 460 (1910).

The facts at bar are clearly distinguishable from those in *Weil*. Paragraph 6 of the FNB/Star lease provided FNB would order the sawmill equipment selected by Star, but FNB was not to be held liable for specific performance or damages if for any reason the supplier or manufacturer, *viz.*, Industrial, delayed or failed to fill the order. Under these terms, it was not left solely to FNB's option whether it would choose to perform the lease agreement. FNB was only exempt from legal liability under the agreement if Industrial or some other third party supplier or manufacturer failed to deliver the equipment ordered by FNB. This exculpatory language contained in paragraph 6 is particularly reasonable since Star was permitted under the parties' agreement to choose the supplier or manufacturer. Thus, except for the failure of a third party supplier or manufacturer to deliver equipment, FNB was obligated to perform its obligations in all respects and as required by the original lease agreement.

It is at this point that we must disagree with the trial court's decision. The original lease agreement signed by FNB and Star on January 14, 1977, was later altered two

different times by Star, Industrial, FNB and its agent, FALCO. Moore guaranteed Star's obligations under the January 14 lease and not the lease obligations to which Star later agreed.

In considering the liability of a guarantor under Arkansas law, our Supreme Court has repeatedly held that a guarantor is entitled to have his undertaking strictly construed and that he cannot be held liable beyond the strict terms of his contract. *Lee v. Vaughn*, 259 Ark. 424, 534 S.W. 2d 221 (1976). In the case of *National Bank of Eastern Arkansas v. Collins*, 236 Ark. 822, 370 S.W. 2d 91 (1963), the court stated the rule as follows:

> A guarantor, like a surety, is a favorite of the law, and his liability is not to be extended by implication beyond the express terms of the agreement or its plain intent.

In still another case concerning the extent of a guarantor's obligation, the court in *Spears* v. *El Dorado Foundry Machine & Supply Company*, 242 Ark. 590, 414 S.W. 2d 622 (1967), held the guarantor was not liable where the underlying agreement was changed not only in form but in substance. In sum, we can say that Arkansas case authority has adopted the well settled principle of the law of guaranty that a material alteration in the obligation assumed, made without the assent of the guarantor, discharges him. See *Wynne, Love & Company* v. *Bunch*, 157 Ark. 395, 248 S.W. 286 (1923).

In the instant case, Moore specifically guaranteed monthly lease payments when due and payable under the January 14, 1977, lease agreement. Star, as noted previously, was to commence lease payments after all equipment was delivered. However, when Industrial refused to deliver the equipment, Star agreed, at FALCO's urging, to begin payments to FNB upon delivery of only part of the equipment. This occurred after FALCO agreed, by a commitment letter dated March 15, 1977, to Star and Industrial, to furnish interim financing for the purchase of the sawmill equipment.

FALCO later discovered it could not lawfully finance the equipment, and it arranged for FNB to provide the interim funds. FNB agreed to do so by letter to Industrial on March 30, 1977. FNB set out the terms of the loan to Industrial in the March 30 letter, and the terms, which included the withdrawal of FALCO's letter that called for a change when Star's payments were to begin, were accepted by Star and Industrial on April 5, 1977.

The rules of law adopted by our courts concerning the extent of a guarantor's obligation prompt us to hold that Moore was discharged when FALCO, by its March 15 letter, successfully acquired Star's acceptance to begin lease payments on partial delivery of the equipment. Of course, this FALCO letter agreement was effectively withdrawn by FNB pursuant to its March 30 letter, but we believe this act was of no moment even if it had been done with the view of restoring Star's lease payment terms provided by the lease. First, it is not clear that FNB's successful withdrawal of FALCO's commitment letter reinstated the time when payments were to occur under the lease. Even if it were clear that FALCO and FNB successfully restored the original lease payment terms, we adhere to the rule that a restoration of an instruction once materially altered is ineffective, regardless of the motive of alteration, on the ground that an obligation once destroyed cannot, in the nature of things, be resuscitated without the consent of the obligor. See 4 Am. Jur. 2d, Alteration of Instruments, § 11; Williston on Contracts, 3rd ed., § 1900; and cases cited in 155 A.L.R. 1209.

In conclusion, we note FNB's argument that the issue posed by Moore concerning a material alteration in the agreement was not presented to the trial court. Moore did file an amended answer in the proceeding below that specifically alleged a material change in the original lease terms which he concluded excused his obligation as guarantor. When Moore filed his amended answer, he was operating under the mistaken belief that the material change was due to an addendum dated February 2, 1977, and executed by FNB and FALCO wherein FALCO was to provide interim financing for the leased equipment. At trial, the evidence showed the addendum was never executed, so it did not affect

or change the terms of the lease. As we have already discussed, however, the proof at trial did show that a material change occurred in the lease payments. This change was supported by the testimony of FALCO's President as well as FALCO's March 15 letter introduced without objection at trial. Since Moore pled a material change occurred in the lease terms and evidence was adduced at trial on this issue, we fail to see how FNB is prejudiced in arguing the issue on appeal.

FNB next contends that if FALCO intended by its March 15 letter to act for FNB, FALCO exceeded its authority, and FNB was not bound to the addressee. However, paragraph 17 of the lease agreement provides that FALCO is the agent of FNB to perform all obligations of, to receive all payments or notices due and to "otherwise act in all respects" for FNB under the lease. FALCO was a party to this business transaction from the time it was first contacted by Star. It was FALCO which engaged its affiliate, FNB, to participate in this transaction. When FALCO needed to obtain financing for Industrial, it arranged for FNB to provide it. When it became necessary for FALCO to withdraw its financial commitment to Industrial, FALCO called on FNB to arrange it. Nowhere in FNB's March 30 letter that requested the parties to waive their rights acquired by virtue of FALCO's letter was it mentioned that FALCO had exceeded its authority when acting for FNB. FALCO negotiated and acted on behalf of FNB throughout this financial transaction, and there is evidence in the record to show that FALCO did not have the authority to alter Star's payments under the lease. See *Robertson v. Southwestern Company*, 136 Ark. 417. 206 S.W. 755 (1918). Under the express terms of the lease and by the actions of FALCO and FNB, we see no merit in this argument.

For the reasons stated, we reverse and remand with directions to the trial court to vacate judgment and dismiss FNB's action against Moore.

Reversed and remanded.

CLONINGER, J., dissents.